# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs August 9, 2016

## STATE OF TENNESSEE v. TRAVIS LINDSEY

**Appeal from the Circuit Court for Maury County**
**No. 22119   Stella Hargrove, Judge**
_____

**No. M2015-01954-CCA-R3-CD – Filed October 12, 2016**
_____

The Defendant, Travis Lindsey, was convicted by a Maury County Circuit Court jury of the sale of 0.5 gram or more of cocaine within 1000 feet of a school, a Class A felony, and sale of 0.5 gram or more of cocaine, a Class B felony. *See* T.C.A. §§ 39-17-432 (2014) (school zone), 39-17-417(A)(3)(C)(1) (2010) (amended 2012, 2014) (sale of cocaine). The trial court sentenced the Defendant to concurrent sentences of twenty years for the sale of cocaine in a drug-free zone conviction and ten years for the sale of cocaine conviction. The court also ordered concurrent service with an unrelated sentence in federal court. On appeal, the Defendant contends that (1) the evidence is insufficient to support his conviction for sale of cocaine in a drug-free zone, (2) the court erred by allowing testimony relative to the Defendant's prior bad acts, and (3) the court erred by admitting into evidence recorded statements in violation of the Confrontation Clause. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and J. ROSS DYER, J., joined.

Michael Cox (on appeal) and L. Samuel Patterson (at trial), Columbia, Tennessee, for the appellant, Travis Lindsey.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Counsel; Mike Bottoms, District Attorney General; and Brent A. Cooper, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

This case relates to two controlled drug purchases conducted by the Columbia Police Department. At the trial, Columbia Police Officer Brian Grey testified that in April 2012, Kevin Odie[1] approached the police with information related to purchasing cocaine and that Mr. Odie arranged a meeting to purchase two grams of crack cocaine for $100. Officer Grey stated that he installed a video camera in Mr. Odie's car. Officer Grey said that he searched Mr. Odie and his car for cash and drugs before Mr. Odie left. Officer Grey stated that when Mr. Odie returned from the meeting, Officer Grey retrieved a video recording from the camera. Officer Grey identified the April 12, 2012 recording, a portion of which was played for the jury.

Officer Grey testified that when Mr. Odie returned he gave the officers a bag containing crack cocaine. Officer Grey said that he sent the bag to the Tennessee Bureau of Investigation (TBI) laboratory for analysis. He stated that he met with Mr. Odie again on April 26, that Mr. Odie's girlfriend accompanied him, and that Mr. Odie had received a text message from a person Mr. Odie identified as the Defendant asking him to come to the "Country Club," an afterhours bar. Officer Grey said that later that day, Mr. Odie met the officers at the police station after meeting the Defendant and that Mr. Odie gave him a bag containing crack cocaine, which Officer Grey sent to the TBI for analysis. Officer Grey said that based upon his experience, he thought each bag contained about two grams of crack cocaine.

Officer Grey testified that he had worked daily for about eight and one-half years in the area around Horace Porter School. He identified the school on an aerial map, which was received as an exhibit. Officer Grey identified on the aerial map the location of the April 12 transaction. Officer Grey stated that he used a computer program provided by the City Engineer to calculate the distance between the sale location and the school and that he also measured the distance by walking and using a measuring wheel. Officer Grey said he calibrated the measuring wheel to ensure its accuracy and that the distance between the approximate site of the sale and the school was 441 feet. Officer Grey acknowledged that he stopped measuring about fifteen feet from the actual site of the sale due to safety concerns.

On cross-examination, Officer Grey testified that Mr. Odie had pending charges for selling drugs when he contacted the police and that as a result of his cooperation with the police, Mr. Odie's bond was reduced on April 5 from $100,000 to $2,500. Officer Grey agreed that Mr. Odie's bond was reduced in order for Mr. Odie to help the police. Officer Grey agreed that an informant who testified at a trial generally received more

---

[1] The record reflects two spellings of the informant's surname. For consistency, we use Odie.

consideration than one who remained confidential. Officer Grey did not remember when he first met Mr. Odie and said that he did not provide Mr. Odie names of people from whom the police wanted Mr. Odie to purchase drugs. Officer Grey said that he asked Mr. Odie to compose a list of people from whom Mr. Odie could purchase drugs, that Officer Grey researched the individuals, and that Officer Grey looked for people who were "bigger drug dealer[s]" than Mr. Odie.

Officer Grey testified that the April 12 meeting with Mr. Odie occurred near dusk and that Mr. Odie contacted him about the meeting. Officer Grey said that Mr. Odie drove his car to meet the Defendant. Officer Grey stated that he spent about ten minutes with Mr. Odie and that Officer Grey searched Mr. Odie's car "pretty good" in that time. Officer Grey said that he did not know in advance where Mr. Odie was going to meet the Defendant and that although Officer Grey and Sergeant Ushery followed Mr. Odie's car, they did not see the transaction between Mr. Odie and the Defendant. Officer Grey stated that he was about 200 yards from Mr. Odie and that he did not have a clear line of vision. Officer Grey said that although he placed an audio transmitter in Mr. Odie's car, the device did not transmit audio after Mr. Odie left the car. Officer Grey agreed that several people were visible and audible on the video recording. Officer Grey stated that he did not obtain Mr. Odie's text messages with the Defendant because Mr. Odie used a prepaid cell phone and because Mr. Odie changed telephone numbers. Officer Grey said that the police department did not provide Mr. Odie's cell phone. Officer Grey said that the police utilized a tool to attempt to trace the telephone number Mr. Odie identified as belonging to the Defendant. Officer Grey acknowledged that he could have obtained a subpoena for the telephone company's records related to the number but said that he thought the number belonged to a prepaid cell phone. Officer Grey said that although Mr. Odie dictated a license plate number for a Saturn vehicle, the officers were unable to locate title records for the number.

Officer Grey testified that on April 26, Mr. Odie told Officer Grey that he had arranged to purchase two grams of crack cocaine for $100 from the Defendant and that Mr. Odie traveled to the purchase location in his girlfriend's car. Officer Grey did not remember whether the Defendant or Mr. Odie sent the text message about meeting at Country Club. Officer Grey agreed that he did not review other text messages on Mr. Odie's phone. Officer Grey was unsure how long he met with Mr. Odie and his girlfriend on April 26. Officer Grey said that he searched Mr. Odie's shoes on April 26 but that he did not remember searching Mr. Odie's shoes on April 12. Officer Grey stated that he and another officer searched Mr. Odie's girlfriend's car and that Officer Grey searched Mr. Odie's girlfriend's purse. Officer Grey said that his undercover police vehicle was not equipped with a video camera and that he did not record the searches of Mr. Odie, his girlfriend, or their cars.

Officer Grey testified that on April 26, he and another officer followed Mr. Odie and his girlfriend and parked behind a building to listen to the transaction. Officer Grey agreed that the video recording of the transaction showed Mr. Odie walk to a building with a metal carport and that several black men sat underneath the carport, including a man wearing a purple shirt and a purple hat. Officer Grey did not remember seeing anything in the man's hands, and Officer Grey could not determine if the man was Darnell Sharp. Officer Grey said that Mr. Odie wore the video camera on his wrist.

Officer Grey testified that he had not obtained the legal description of the school property and that he had a mapping system on his computer which marked property lines with a red outline. Officer Grey acknowledged that the City Engineer explained the mapping system to him six or seven years before the trial and that he did not consult with the City Engineer in connection with this case. Officer Grey said that the property line of the school was "common knowledge" because it was marked by a fence.

Officer Grey testified that on the video recording, Mr. Odie spoke to several individuals and that not all of their faces were visible on the recording. Relative to the April 12 transaction, Officer Grey said that he was unable to follow Mr. Odie's car closely because the undercover narcotics cars were known in the community. Officer Grey said that Mr. Odie called them en route and told them "Travis" had called and told him to meet at "the shop on 10th."

Kevin Odie testified that he had felony drug convictions for selling cocaine, that in April 2012, he had a pending probation violation and had been indicted on new drug charges, and that he offered to help the police with the hope of avoiding prison. Mr. Odie said that if his probation were revoked, he would serve "twenty-something" years. Mr. Odie said that he purchased drugs from more than forty people while helping the police department. Mr. Odie stated that his life involved significant criminal activities but that since April 2012, he had changed and had moved away from Columbia to live with family.

Mr. Odie testified that when he worked with the police department, he chose the people from whom he bought drugs. He said that the April 12 transaction was his first time helping the police. He agreed that the reduction in his bond the weekend before the April 12 transaction was part of the arrangement with the police department. He stated that after his release, he was required to stay in contact with the police, that the police were able to search him at any time, and that he was required to undergo drug testing if asked. He said that after his release from jail, he did not consider himself to be a free man.

Mr. Odie testified that on April 12, he met Officer Grey, that he had spoken with the Defendant by telephone or text message earlier in the day, and that he had arranged to meet the Defendant. Mr. Odie said that he was supposed to meet the Defendant in College Hill in order to purchase one or two grams of cocaine for $100. Mr. Odie stated that Officer Grey would not meet with him unless he had already arranged a transaction. Mr. Odie said that when he met Officer Grey, officers searched Mr. Odie's car and reviewed what he was supposed to do. Mr. Odie stated that his then-girlfriend accompanied him, although the girlfriend did not participate in the transaction. After reviewing the video recording, though, he said the girlfriend did not accompany him that day. Mr. Odie said that he never took drugs with him to the transactions. Mr. Odie denied representing that his own drugs had been sold to him by another person. Mr. Odie said that if he had tried to trick the police, he would have gone to prison. Mr. Odie stated that the police provided an audiovisual recording device he wore on his left wrist, that he was supposed to try to get a good recording of the transaction, and that he did his best to record it. Mr. Odie said that they also placed an audio transmitter under one of his car's seats. Mr. Odie stated that Officer Grey followed his car in Officer Grey's undercover police vehicle.

The video recording of the April 12 transaction was received as an exhibit and played for the jury. The recording showed Officer Grey, who said that they were conducting a "CI sale" from the Defendant. Officer Grey spoke briefly with Mr. Odie. The recording showed Mr. Odie's driving to a location with a house and a carport, Mr. Odie's speaking with a group of older people at the carport, and Mr. Odie's leaving the group and talking with a man wearing a red shirt, a baseball cap, and a silver chain and cross. The man had a prominent gold tooth. Mr. Odie spoke with the man very briefly, walked back to his car, and drove directly to a different location, where he met with the officers. Mr. Odie described the Defendant's car to the officers as a brown Saturn with tinted windows and "rims."

Mr. Odie testified that on April 12, he met the Defendant at the Defendant's father's shop, which was "right up the street" from Horace Porter School. Mr. Odie acknowledged that generally, many people were at the shop. Mr. Odie said that when he arrived at the shop, he waited for about one and one-half minutes for the Defendant to arrive and that he exited the car to speak to some of the people while he waited. Mr. Odie identified the man wearing red as the Defendant. Mr. Odie stated that he and the Defendant walked to Mr. Odie's car, Mr. Odie gave the Defendant cash, and the Defendant gave him cocaine. Mr. Odie acknowledged that the transaction lasted less than thirty seconds and that drug deals generally took place rapidly to avoid police attention.

Mr. Odie testified that in the recording, when he said "that 'MF' was right," he referred to the weight of the drugs and that he told the Defendant he would return to buy more cocaine. Mr. Odie agreed that he led the Defendant to believe Mr. Odie was selling the cocaine. Mr. Odie identified three photographs of the Defendant, which were taken from the recording. Mr. Odie acknowledged that the recording did not show the money he gave the Defendant. Mr. Odie said that the recording showed the Defendant's hands holding the drugs.

Mr. Odie testified that when he returned to his car, he called Officer Grey and asked where he should go. Mr. Odie said that he did not stop between leaving the shop and meeting Officer Grey. Mr. Odie stated that he kept the cocaine in his lap, that it was packaged in a small bag, and that he did not remove or add anything to the bag. Mr. Odie said that based upon experience, the amount of cocaine in the bag appeared to be about two grams.

Mr. Odie testified that on April 26, he met Officer Grey and that the officers searched him. Mr. Odie said that he had arranged to buy two grams of cocaine from the Defendant "downtown" but that he did not remember the agreed-upon price. Mr. Odie said that his girlfriend accompanied him on this occasion.

The April 26 video recording was received as an exhibit and played for the jury. In the recording, Officer Grey said that Mr. Odie was going to buy one or two grams of crack cocaine for $100 from the Defendant. When Mr. Odie entered a white SUV, a female voice was audible. Mr. Odie commented that he was going to "get his a--." Mr. Odie drove past the same set of buildings twice before parking near a large building with a carport. Mr. Odie left the car and spoke to a man wearing purple. When the man in purple asked why Mr. Odie was there, Mr. Odie stated that he was waiting to meet "Bert." The man in purple said, "He's wide open," confirmed he was talking about Bert, and said Bert was "moving too fast." Mr. Odie said that this was the reason he hated meeting Bert in "places like this," and the man in purple commented that he was glad Bert was doing well but "[y]ou gotta put that money away." Mr. Odie walked away from the man in purple and got in the backseat of a brown SUV. Mr. Odie spoke briefly with the driver and told him, "It's booming up there in Lebanon." The driver said, "It's two. I just got it off the board." Mr. Odie exited the brown SUV and returned to the white SUV. During the drive to meet the officers, Mr. Odie commented to the woman, "I can make a career out of this, bring the whole g------ Columbia down." When Mr. Odie met with the officers, he noted that the Defendant's two daughters had been in the brown SUV during the sale.

-6-

Mr. Odie testified that in the recording, when he said he was "going to get his a--," he referred to another person from whom he was going to purchase drugs. Mr. Odie stated that he met the Defendant at Country Club at the Defendant's request.

Mr. Odie testified that when he arrived, several people were standing under a carport and that the Defendant was not present. Mr. Odie identified the man wearing purple as Darnell Sharp and said that although Mr. Odie spoke to Mr. Sharp, Mr. Odie did not see anything in Mr. Sharp's hands or purchase anything from him. When asked whether Mr. Sharp had something in his hand, Mr. Odie said that he thought Mr. Sharp had a paper towel in his hand. Mr. Odie said that Bert referred to the Defendant. Mr. Odie said that Mr. Sharp's stating the Defendant was "too wide open" meant the Defendant was selling drugs to anyone who wanted them.

Mr. Odie testified that the Defendant arrived in a car, that Mr. Odie got in the backseat of the car, that the Defendant said he had just weighed the cocaine, and that the Defendant said it weighed two grams. Mr. Odie noted that the Defendant's stating he got the cocaine "off the board" meant measuring it with scales. Mr. Odie said that the Defendant's two minor daughters were in the car. Mr. Odie identified the Defendant in three still photographs taken from the recording, which were received as exhibits.

Mr. Odie testified that he returned to his car, called the officers, and drove to meet them. He said that he did not stop on the way, kept the cocaine in his lap, and did not add or remove anything from the bag. Mr. Odie said that he told the Defendant many people were buying drugs in Lebanon and that he led the Defendant to believe Mr. Odie intended to resell the cocaine. Mr. Odie identified the bag of cocaine he purchased and said that it appeared to weigh slightly less than two grams. Mr. Odie denied purchasing drugs from anyone other than the Defendant on April 12 and April 26.

On cross-examination, Mr. Odie testified that in April 2012, he had been arrested for sale of marijuana and cocaine in a drug-free zone and for sale of cocaine. Mr. Odie said that he was arrested in January 2012 and was in jail until his release in April. Mr. Odie agreed that his drug charges were pending at the time of the trial. When asked whether he hoped he would receive a reduced sentence or probation in exchange for his work for the police, Mr. Odie said he did not know because nothing had been promised.

Mr. Odie denied that he or his attorney contacted the District Attorney's Office to advise them he was willing to help the police. Mr. Odie stated that he agreed to work for the Drug Task Force in exchange for reducing his bond. Mr. Odie said that he did not tell the police about specific people from whom he intended to purchase drugs. Mr. Odie stated that if Officer Grey testified about making or reviewing a list of people with Mr. Odie, Officer Grey was mistaken. Mr. Odie said, though, that the police gave him a list

of names and asked whether Mr. Odie could purchase drugs from any of those people. When asked whether the Defendant was a person from whom Mr. Odie claimed he could purchase drugs, Mr. Odie said, "His name wasn't on that list."

Mr. Odie testified that although he had been paid for some of his purchases, he was not paid for his work on the Defendant's case and had not been paid to testify at the trial. Mr. Odie said that he was on probation for driving on a suspended license. He stated that he was incarcerated between 1997 and 2007, that he was charged with sale of cocaine about one and one-half months after his release, that he was placed on probation, and that he was convicted in 2009 of misdemeanor sale of marijuana, for which he was incarcerated. Mr. Odie stated that before he testified, he watched the video recordings in order to refresh his memory of events.

Mr. Odie testified relative to the April 12 sale that he used his personal cell phone to send a text message to the Defendant, that he had not saved the text messages, and that he did not give Officer Grey a copy of the text messages because Officer Grey was present for most of the text message conversation. Mr. Odie recalled showing Officer Grey the messages. Mr. Odie stated that Officer Grey met with him for five or ten minutes before the transaction, that Officer Grey searched Mr. Odie's car by pulling up the floor mats, looking under the seats, and pulling the seats forward, and that Officer Grey searched Mr. Odie. Mr. Odie agreed that Officer Grey put a recording device in Mr. Odie's car and gave Mr. Odie one to wear.

Mr. Odie testified that when he left Officer Grey, he did not know the exact location where he would meet the Defendant. Mr. Odie said that the Defendant chose the location and that he thought the Defendant sent a text message with the location. Mr. Odie said later, though, that he called the Defendant after he left Officer Grey and that the Defendant told him to meet at the Defendant's father's shop. Mr. Odie acknowledged that the recording did not reflect a telephone call and that Officer Grey commented in the recording he did not know where Mr. Odie was going to meet the Defendant. Mr. Odie stated that after the Defendant sent a text message, Mr. Odie sent a text message containing the location to Officer Grey.

Mr. Odie testified that eight or nine people were at the Defendant's father's shop and that Mr. Odie knew one man there. Mr. Odie said that the Defendant was not present when he arrived at the shop. Mr. Odie stated that he had known the Defendant all his life. Mr. Odie said that in 2012, he did not live in Columbia and did not "hang out" with the Defendant.

Relative to the April 26 transaction, Mr. Odie stated that he drove his girlfriend's car, that he met Officer Grey and Sergeant Ushery, that they searched Mr. Odie, Mr.

Odie's girlfriend, and her purse, and that they thoroughly searched the car's passenger compartment and trunk. Mr. Odie thought the search lasted about ten minutes and agreed the officers searched longer than they had on April 12. Mr. Odie said that after leaving the officers, he sent the Defendant a text message when he arrived downtown and that the Defendant responded with instructions to come to Country Club. Mr. Odie stated that he did not show Officer Grey the text message because Officer Grey was following in a separate car.

Mr. Odie testified that when he arrived at Country Club, his girlfriend remained in the car. Mr. Odie said that the Defendant was not present and that Mr. Odie sent the Defendant a text message. Mr. Odie said that he had to circle the downtown area twice because the Defendant had not yet told him where to go. Mr. Odie said that Officer Grey only knew that they were going to 8th Street and Woodland. Mr. Odie stated he told Officer Grey that the Defendant had sent a text message stating the Defendant was on his way downtown and asking Mr. Odie to meet him downtown.

Mr. Odie testified that Mr. Sharp appeared to be reaching toward his pocket in the recording. Mr. Odie agreed that he did not want to go back to prison but denied he would "do whatever" to stay out of jail.

On redirect examination, Mr. Odie testified that although he and the prosecutor met to review the video recordings, he and the prosecutor never discussed the content of the recordings, and the prosecutor did not otherwise prepare him for the trial. Mr. Odie said that on April 12, he knew where the Defendant's father's shop was located because he had known the Defendant for a long time. Mr. Odie said that the Defendant's family members, including the Defendant's mother, were present at the shop. Mr. Odie stated that other than what was captured by the recording, he did not interact with the Defendant. Mr. Odie did not remember what he did on April 12 while he waited for the Defendant to arrive. Mr. Odie said that the April 26 recording showed him passing Country Club twice as he circled the block. He stated that he did not know Mr. Sharp would be at Country Club, that Mr. Sharp did not sell cocaine, and that Mr. Sharp had smoked cocaine previously. Mr. Odie said that it did not occur to him while he was at Country Club that he could purchase cocaine from Mr. Sharp. Mr. Odie said that had Mr. Sharp offered to sell cocaine, it would have been unusual and would have caused Mr. Odie to suspect the cocaine was fake.

Mr. Odie testified that Mr. Sharp's comment about putting away money related to the conversation they were having and that Mr. Sharp referred to the Defendant in multiple comments. Mr. Odie said that he did not have money in view when he talked to Mr. Sharp and that Mr. Odie did not think Mr. Sharp was telling him to put away money. Mr. Odie stated that he entered the Defendant's car to purchase crack cocaine. Mr. Odie

said that someone wearing yellow was in the backseat when he got into the Defendant's SUV. A photograph taken from the video recording showed the person in yellow. Mr. Odie said that his work with the police had led to more than forty indictments and that it had caused Mr. Odie problems.

TBI Special Agent Brent Trotter, an expert in controlled substance identification, analyzed the substances in this case. Relative to the April 12 transaction, Agent Trotter testified that the substance weighed 2.13 grams and contained cocaine base. Relative to the April 26 transaction, Agent Trotter stated that the substance weighed 1.74 grams and contained cocaine base.

The parties stipulated that Horace Porter School was a school. In a jury-out hearing, the trial court noted that the Defendant had a gold tooth, and the Defendant showed the jury his teeth.

Upon this evidence, the Defendant was convicted of the sale of 0.5 gram or more of cocaine within 1000 feet of a school and of 0.5 gram or more of cocaine. The trial court sentenced the Defendant to an effective twenty-year sentence. This appeal followed.

# I

## Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to support his sale of 0.5 gram or more of cocaine within 1000 feet of a school conviction, arguing that the State did not establish the location of the sale or the location of Horace Porter School beyond a reasonable doubt. The State responds that sufficient evidence established both locations. We agree with the State.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see also State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

It is a crime to sell a controlled substance. T.C.A. § 39-17-417(a)(3). The sale of cocaine is a Class B felony "if the amount involved is point five (.5) grams or more[.]" T.C.A. § 39-17-417(c)(1) (2010) (amended 2012, 2014). Tennessee Code Annotated section 39-17-432(b)(1) states, "A violation of § 39-17-417 . . . that occurs . . . within one thousand feet (1,000′) of the real property of [a school] shall be punished one (1) classification higher than is provided in § 39-17-417(b)-(i) for such violation."

In the light most favorable to the State, the record reflects that the Defendant met Mr. Odie on April 12, 2012, at the Defendant's father's shop. Mr. Odie testified that he gave the Defendant $100 and that the Defendant gave him a small plastic bag containing cocaine. Officer Grey stated that Mr. Odie gave him a small bag of cocaine after meeting the Defendant. Agent Trotter said that the substance in the bag contained 2.13 grams of cocaine base. The video recording showed the Defendant's face, including a distinctive gold tooth. Officer Grey testified that he identified the location of the transaction based upon the video recording. Officer Grey had worked in the area for eight years and recognized the address of the Defendant's father's shop. Officer Grey stated that he measured the distance between the fence of Horace Porter School and the location of the transaction and that the distance was 441 feet. Any conflicts in the evidence were resolved by the jury in favor of the State. The evidence is sufficient.

Relative to the location of the school's property line, Officer Grey did not obtain the deed for the property. However, Officer Grey testified that he used a computer program provided by the City Engineer to outline the property line of the school, that the school property was surrounded by a fence, and that it was common knowledge the school property began at the fence. Officer Grey's calibrated measuring wheel measured the distance between the school and the approximate location of the transaction as 441 feet, and Officer Grey acknowledged that he stopped measuring about fifteen feet from the actual site of the sale. In any event, the April 12 sale occurred approximately 456 feet from the school's fence line, well within the 1000 feet required by the statute. The Defendant is not entitled to relief on this basis.

## II

## Other Bad Act Evidence

The Defendant contends that the trial court erred by allowing Mr. Odie to testify about the meaning of a portion of the April 26 video recording in which Darnell Sharp commented that the Defendant was "wide open." The Defendant argues that the statement constituted evidence of a bad act and should have been excluded under Tennessee Rule of Evidence 404(b). The State responds that the Defendant has waived consideration of the issue by failing to take reasonable action at the trial to prevent any error. Alternatively, the State argues that the Defendant objected at the trial on the basis of the Confrontation Clause and cannot argue for the first time on appeal the evidence should have been excluded pursuant to the rules of evidence.

Tennessee Rule of Evidence 404(b) prohibits the admission of evidence related to other crimes, wrongs, or acts offered to show a character trait in order to establish that a defendant acted in conformity with the trait. Tenn. R. Evid. 404(b). Such evidence, though, "may . . . be admissible for other purposes," including, but not limited to, establishing identity, motive, common scheme or plan, intent, or absence of mistake. *Id.*; *see State v. McCary*, 119 S.W.3d 226, 243 (Tenn. Crim. App. 2003). Before a trial court determines the admissibility of such evidence,

> (1) The court upon request must hold a hearing outside the jury's presence;
>
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;
>
> (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and
>
> (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b)(1)-(4). The standard of review is an abuse of discretion, provided a trial court substantially complies with the procedural requirements. *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997); *see State v. Electroplating, Inc.*, 990 S.W.2d 211 (Tenn. Crim. App. 1998).

The record reflects that trial counsel objected to Mr. Odie's testimony relative to Mr. Sharp's saying the Defendant was "wide open" but that the basis for the objection

was speculation about Mr. Sharp's mental state. The prosecutor agreed to move on from the questioning. During a jury-out hearing, the trial court cautioned the prosecutor for agreeing to move on before the court had the opportunity to rule on the objection. At that time, counsel commented that he could not cross-examine Mr. Sharp. The court clarified that it was referring to Mr. Odie's interpreting Mr. Sharp's words, and counsel reiterated that Mr. Odie would have been speculating about Mr. Sharp's state of mind.

In the motion for a new trial, trial counsel argued that the trial court erred by allowing the portion of the video recording documenting the conversation between Mr. Odie and Mr. Sharp to be played for the jury. Counsel did not raise as an issue Mr. Odie's interpreting the meaning of "wide open." At the motion for a new trial hearing, counsel argued that it was prejudicial to allow the recording because Mr. Sharp did not testify at the trial and because Mr. Sharp referred to the Defendant's "prior drug dealing activity." Even if counsel's objection to Mr. Sharp's characterization of the Defendant as "wide open" were an attempt to raise a Rule 404(b) issue, counsel did not request a jury-out hearing during the trial relative to Mr. Odie's defining "wide open," and as a result, the record does not reflect any consideration of this issue or findings by the trial court.

Because the record is undeveloped as to any potential Rule 404(b) issue, the Defendant failed to take reasonable action to prevent any error, and the issue is waived. *See* T.R.A.P. 36(a). The Defendant is not entitled to relief on this basis.

### III

### Confrontation Clause Violation

The Defendant contends that Darnell Sharp's statements on the video recording violated the Confrontation Clause because Mr. Sharp was not presented as a witness, the statements were elicited in order to gather evidence against the Defendant, and no exception to the rule against hearsay applied. The State responds that the Confrontation Clause was not violated because the statement was non-testimonial.

The Confrontation Clause provides a criminal defendant the rights to confront and cross-examine witnesses. *See* U.S. Const. amends. VI, XIV; Tenn. Const. art. I, § 9; *State v. Williams*, 913 S.W.2d 462, 465 (Tenn. 1996). In *Crawford v. Washington*, 541 U.S. 36, 59 (2004), the Supreme Court concluded that the Confrontation Clause permits the admission of "[t]estimonial statements of witnesses absent from trial . . . only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." A statement is testimonial when "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial[.]" *Id*. at 51-52 (internal quotation marks and citation

omitted); *see Davis v. Washington*, 547 U.S. 813, 822 (2006). In order for a testimonial statement to be admissible, the declarant must be unavailable to testify, and the defendant must have had a prior opportunity to cross-examine the declarant. *Crawford*, 541 U.S. at 53-55; *see Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 309 (2009). However, the Confrontation Clause is not implicated when testimonial statements are not used to show the truth of the matter asserted. *Crawford*, 541 U.S. at 59 n.9.

As a preliminary matter, we note that trial counsel objected to various statements from the video recording but did not fully articulate an objection on confrontation grounds. The first objection occurred during Mr. Odie's direct examination. The prosecutor asked Mr. Odie what Mr. Sharp meant by the phrase "wide open." The basis for counsel's objection was speculation. During a jury-out hearing, the trial court cautioned the prosecutor for agreeing to move on from the line of questioning before the court had the opportunity to rule on the objection, and counsel commented that he could not cross-examine Mr. Sharp. The court clarified that it was referring to Mr. Odie's interpreting Mr. Sharp's words, and counsel reiterated that Mr. Odie would have been speculating about Mr. Sharp's state of mind. No further objections were lodged relative to Mr. Sharp's statement.

On cross-examination, counsel asked Mr. Odie questions about who commented that the Defendant needed to "put that money back." Mr. Odie said that Mr. Sharp made the comment. On redirect examination, the prosecutor asked Mr. Odie who he and Mr. Sharp discussed, and Mr. Odie said the Defendant. The prosecutor asked Mr. Odie what the Defendant's nickname was in the video, and counsel objected. Counsel stated that he did not know whether Mr. Odie or Mr. Sharp referred to the Defendant as "Bert" and that he could not cross-examine Mr. Sharp. The court said, "Well, we heard it. Ask him if that's what we heard out of him." Counsel requested a jury-out hearing, but the court only permitted a sidebar conference, which is not contained in the transcript. Afterward, the prosecutor resumed questioning and laid a foundation as to the Defendant's nickname based upon the conversation between Mr. Odie and Mr. Sharp. Later, the prosecutor asked Mr. Odie to whom Mr. Sharp referred when he said that someone needed to "put that money away." Counsel objected on the basis of hearsay and speculation about Mr. Sharp's state of mind. The court overruled the objection, stating that it would allow Mr. Odie to give his opinion as to who he thought was the subject of the conversation. No further objections were lodged about the video recording.

During closing argument, the prosecutor mentioned that much time was spent discussing the second video recording and the phrase "he should put that money away." When discussing the April 26 transaction, the prosecutor said that although counsel had focused on the phrase "[he] needs to put that money [away]," the jury should listen to the phrase in the context of the conversation, and that the conversation consisted of Mr. Odie

-14-

and Mr. Sharp discussing the Defendant's "running wide open." The prosecutor stated, "Mr. Odie told you what that meant. That meant that he's basically out there selling dope to anybody that will buy it."

In the motion for a new trial, counsel argued that "it was error for the court to allow in a portion of the audio recording" between Mr. Odie and Mr. Sharp, but did not state the legal basis for the argument. At the motion for a new trial hearing, counsel argued that it was prejudicial to allow the recording because Mr. Sharp did not testify and because Mr. Sharp referred to "prior drug dealing activity." Counsel made no reference to the Confrontation Clause.

Although we interpret counsel's remarks as an attempt to raise a violation of the Defendant's confrontation rights, the record does not reflect further argument by the parties or findings by the trial court relative to a confrontation violation. As a result, the issue was not fully litigated in the trial court and is waived for purposes of appellate review. *See* T.R.A.P. 36(a) (stating that this court may not act in contravention of the trier of fact, and that relief is not required for any party who fails to take reasonable action to prevent an error). The Defendant is not entitled to relief on this basis.

We note, however, that Mr. Sharp's statements were irrelevant relative to whether the Defendant sold cocaine to Mr. Odie and should have been excluded on this basis. *See* Tenn. R. Evid. 401, 402. The statements do not have "any tendency to make the existence of a fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Moreover, the statements implied the Defendant was a known drug dealer, which was impermissible propensity evidence showing that the Defendant was more likely to have sold cocaine to Mr. Odie because he was a drug dealer. Evidence of a character trait is not admissible to prove a defendant's propensity to act in conformity with that trait. Tenn. R. Evid. 404(a). The audio recording containing Mr. Sharp's statements to Mr. Odie should have been redacted.

However, the error affords the Defendant no relief because the evidence of his guilt is overwhelming. Officer Grey testified that on April 26, he searched Mr. Odie, Mr. Odie's girlfriend, and her car and that after meeting with the Defendant, Mr. Odie returned with a bag of a white substance later determined to be 1.78 grams of cocaine base. The video recording showed Mr. Odie's entering a brown SUV and speaking briefly with the Defendant about two grams that were "fresh off the board" before returning to the officers' location. Mr. Odie testified about the circumstances of the transaction and identified the Defendant in the recording.

-15-

In consideration of the foregoing and the record as a whole, we affirm the judgments of the trial court.


_____
ROBERT H. MONTGOMERY, JR., JUDGE